WAUCHULA MANUFACTURING & TIMBER COMPANY, A
    CORPORATION, *Plaintiff in Error,* v. WILLIAM D.
    JACKSON, *Defendant in Error.*

· Opinion filed Jan. 5, 1916.

1. A verdict should be set aside when it clearly appears to be
    contrary to law.

2. Where contributory negligence prevents recovery, and it
    clearly appears from the evidence that the negligence of the
    plaintiff so contributed proximately to the injury complained
    of that it would not have occurred but for the plaintiff's
    negligence, a verdict awarding damages should be set aside.

3. At common law a plaintiff could not recover for injuries to
    himself caused by the negligence of another if he in any
    appreciable way contributed to the proximate cause of the
    injury, upon the theory that there is no apportionment of the
    results of mutual negligence.

4. If a servant fails to exercise ordinary care for his safety, he
    cannot in general recover damages for an injury.

5. Where dangers are obvious and the servant is capable of
    appreciating them a warning as to such dangers by the mas-
    ter is unnecessary.

Writ of Error to Circuit Court, DeSoto County; F.
A. Whitney, Judge.

Judgment reversed.

*A. G. Turner* and *P. O. Knight,* for Plaintiff in Error;

*L. M. Hammel, H. S. Phillips* and *H. S. Hampton,* for Defendant in Error.

SHACKLEFORD, J.—William D. Jackson brought an action against the Wauchula Manufacturing & Timber Company, a corporation, to recover damages for personal injuries, alleged to have been received by the plaintiff by reason of negligence of the defendant. A trial was had before a jury, which resulted in a verdict in favor of the plaintiff for the sum of $3,500.00. The defendant seeks to have the judgment entered thereon reviewed and tested here by writ of error.

The original declaration consisted of one count which was amended by leave of court, and afterwards the plaintiff added a second count. The defendant interposed a demurrer to the declaration whereby the sufficiency of each count was questioned, which demurrer was overruled and such ruling forms the basis for one of the assignments. The defendant then filed several pleas and the issues thereby made were submitted to the jury for determination, with the result as above stated. Several errors are assigned, but we see no useful purpose to be accomplished by treating them in detail. One of such assignments is based upon the overruling of the motion for a new trial, which questions the sufficiency of the evidence to support the verdict under the principles of law applicable to such evidence. In other words, it is contended by the defendant "that there is no presumption in favor of the verdict as rendered by the jury in this

case, even though this verdict has been sanctioned by the refusal of the trial court to set it aside, because it is a question of law, and not a question of fact, as to whether or not, under the law, the plaintiff has a right to recover upon the testimony given at the trial." In order to determine the correctness of this contention it is necessary to ascertain just what facts were established by the evidence adduced at the trial. We have given all the evidence our careful examination and are of the opinion that the following facts are clearly established:

At the time of the injury, the plaintiff was employed by the defendant in the capacity of a carpenter and had been in such employment for a period of about two weeks, the plaintiff being about 38 years of age, in good health and had been a carpenter for "something like fifteen years," during which time his work had required him "to work on buildings and on scantlings and up in roofs of buildings." On the morning that the injury occurred, the plaintiff, Lunie Vernon and J. R. King, the latter being designated in the testimony as "the foreman" or "boss-man," were all engaged in doing some work connected with the raising of a conveyor-trough in the plant of the defendant corporation, which conveyor-trough ran under a joist which had to be sawed off before such conveyor-trough could be raised. The plaintiff himself testified as follows: I went to the mill that morning to resume my position as carpenter. When I got down there this moring the chain that runs the hog that grinds up the fuel,—we had just put in the machinery,—they had it torn up and the chain was too long, and so we worked some time at the hog. The fuel had blocked the hog and had everything blocked, and Mr. King asked me to help get the hog fixed and the chain, in order that they

might get the trash out of the mill and I told him very well. We fixed the hog and got that in good shape and I went up to the shaving house to work on the chain. It had torn up the studding and we nailed that back and cut a joist of the shaving house that ran across the top of this iron girder and whilst I was in the house working at it Mr. Vernon taken and sawed, and cut loose this girder from the side of the house, a distance from the side of the house. After he got that cut loose he went to work at something else and Mr. King told me to get some nails and a machine hammer and I went after it and had to go beyond the mill about one hundred and seventy-five yards, and when I came back he had cut this joist off and I climbed up and he called to me to hand up a piece of 2x4 to block up the trough with, so there was a piece lying on the floor and I picked it up and handed it to him. Then I picked up the tools and climbed up and went up to the top. He was working out where he had cut this joist into, and I taken the prize that I had been present when they started to prize up the box and found everything split up, and when I came back Mr. King said go ahead and prize up the box and I got a 2x4 about six or eight feet long and put it across this way (indicating), and I prized down until he said it was enough and he said 'you come across here and help Mr. Vernon, you can be cutting out a loop of this chain' and I did this and came back to the center of the house to straighten up to walk across and I had to step from those joist, which was about thirty inches apart, just a good step, and when I started across Mr. King was sitting down right close to where Mr. Vernon was working and he never said a word to me about the joist being cut, and I stepped on this joist in the center of the house and fell down at least fif-

teen feet, and it knocked me unconscious. I didn't know anything for a second or two and I have been suffering ever since."

The plaintiff further proceeded to testify in his own behalf that he received the injuries "early in the morning, something like eight o'clock or hardly so late as that," and stated, in response to a question as to what the condition at the place was with reference to the light, that they "didn't have any light except two or three doors next to the boilers; one door next to the house was the only door that gave any light at all." The witness further stated that "it was dark in there, you could see how to work, but it was considerable dark in there to work;" that when he stepped from one joist over to the other, a distance of about thirty inches, he did not know that the joist upon which he stepped was extending out without any support under it; that he did not notice that a piece had been cut out of such joist, which left a open space, stating that the joist "had been cut on the other side and was resting on the box, but I didn't notice it was cut on this side," and that neither Mr. Vernon nor Mr. King gave him any notice or warning in any way. On cross-examination, the plaintiff stated that he had been up on the rafters before on the morning that the injury occurred, had walked across from one girder to another, could see one girder from another, it was light enough to see how to work, that if one of those rafters had been out that morning he could have seen it when he was stepping across there, that he did not remember how long before the occurrence of the accident he had been up there, but it was "something like fifteen or twenty minutes." The cross-examination of the plaintiff then proceeded as follows: "Q. Mr. Jackson, you heard Mr.

Vernon's testimony this morning,—state whether or not
Mr. King, in the presence of Mr. Vernon, explained to
you and Mr. Vernon what he wanted done to that trough?
A. Didn't tell me what he wanted done with it: Q.
Were you present when he told Mr. Vernon? A. No,
sir, I didn't hear him tell him what to do with it. Mr.
Vernon was the first one that told me, and Mr. King came
by and said, 'you can help Mr. Vernon.' Q. Were you
near Mr. Vernon at the time Mr. King explained to
Mr. Vernon what he wanted done with that trough?
A. I don't remember. I don't think I was. Q. You
don't remember that at all? A. I don't remember hear-
ing him tell Mr. Vernon what to do with it. Q. Do
you remember Mr. King directing you at all what to do
that morning? A. Yes, sir. Q. What did he say?
A. Said go help Mr. Vernon, and when we got in the
shaving house told me to get a prize and prize up this
iron box. Q. Prior to that time—just try to remember,
if you can—isn't it a fact that Mr. King told you and
Mr. Vernon both, talking to both of you, in the presence
of each other, just exactly what he wanted done? A.
No, sir, the only words that Mr. King told me was
those,—says 'you go help Mr. Vernon.' He didn't tell
me in the presence of Mr. Vernon. He was talking
with Mr. Vernon but I never understood what he said.
Only said, 'you go help Mr. Vernon. We have got to
raise that box.' Q. Didn't tell you how to raise that
box? A. No, sir, said prize up the box. Q. You
remember he did tell you to prize up this box? A. Yes,
sir. Q. What was necessary for you and Mr. Vernon
and Mr. King to do in order to prize up this trough?
A. These girders that went through the top of the house.
there was one up against the girder of the house,—it was

necessary to cut this into or be cut into over against the wall of the house and let it rest still on top of the box. Mr. Vernon did that,—he cut the joist into over next to the wall and, while he was cutting that into Mr. King told me to go get some nails and a hammer and I think Mr. Vernon told me to bring a hammer, and I went away to get a hammer and some nails and when I came back and went up there again I taken the prize and prized this box up and Mr. Vernon put a piece of timber under the box and Mr. King spoke to me and told me to come across and help Mr. Vernon and I started across and stepped on this girder and it fell out with me. Q. This joist you said he was sawing it into when you went for the nails? A. Yes, sir, he had sawed the joist into on the side next to the wall between the iron box and the wall. Q. That was sawed into before you went for the hammer and nails? A. Yes, sir, he was sawing on it. Q. Mr. Jackson, you knew, did you not, from your experience as a carpenter that that joist had to be sawed into on this other side in order to raise this trough? A. No, sir, it wasn't necessary. Q. How could you raise the trough with the joist lying across the top of it? A. Very easy. The other end was twelve or fourteen feet long and was nailed against the side of the wall at one and and rested on the trough at the other end. Q. That joist after the trough was raised was parallel with this other end? A. Yes, sir. Q. If it had been raised without being sawed off it would have been in that position? A. Yes, sir. Q. When you stepped on it was it inclined at all? A. It was like the others as far as I knew. Q. You know, as a matter of experience, that if that trough had been raised four inches, as you stated, that that joist would have had to have been slanted? A. Very

little.  Q.  Was the joist immediately on top of this trough?  A.  Somewhere near it.  Q.  How high did you raise the trough?  A.  Four inches.  Q.  Then that joist would have had to have gone up four inches?  A. Yes sir.  Q.  And when you stepped on it it was exactly the same as the other joist?  A.  As far as I know, I wasn't expecting that joist to be moved.  Q.  Wasn't that enough to show you it hadn't been left on the trough and raised with the trough?  A.  I had no idea of one sawing a timber and it being left in that position.  Q. Your fifteen years experience as a carpenter would teach you, would it not, that that joist wasn't raised at all with the trough?  A.  No, it would not.  Q.  You knew, did you not, that if it was left on top of the trough and the trough raised four inches that this joist would have naturally to be raised four inches?  A.  Yes, sir, but we was in a hurry as the mill was blocked and we was working hard to get everything to running.  Q.  As a matter of fact, you were in a hurry and didn't pay any particular attention to this joist?  A.  I didn't notice anything being wrong.  Q.  If that joist was sawed off a foot from this trough, as your witness states it was, could you have seen it that morning before stepping on it?  A.  If I had known it had been cut off, yes sir.  Q. If you had looked before you stepped on it you could have seen it?  A.  Yes, sir.  Q.  As a matter of fact you didn't look?  A.  I was in a hurry and I wasn't near it when it was cut off and wasn't expecting it.  Q. The place that was cut, was that open and clear to be seen?  A.  No, sir, the studding that held up the shaft and pulley that was pulling this chain,—it came right up near to the box and it would have left it in a position that a man would not have noticed it, a man not thinking about anything

like that. Q. But you could have seen it? A. Yes, sir, I could have seen it, but I had no idea of it being like that. Q. You knew, however, that that particular rafter had been sawed off once before you left for the nails and hammer? A. Yes, sir. Q. And yet you before stepping on that rafter didn't look to see its condition? A. No, sir, the joist looked all right where I was, as I had to stoop over and it put me in a bad position to look. Q. Isn't it a fact that the particular part of that joist which was sawed off was carried up to you to put under the trough when it was raised? A. I couldn't tell you. Q. Isn't it a fact that the piece of scantling was of the same dimensions as those joists? A. I don't remember, I think it was. Q. Your experience of fifteen years with scantlings would give you an impression on picking it up, as to whether it was the same or not? A. Yes, sir, I suppose it was. We had other pieces of scantling. I didn't pay any attention to what size of piece it was. Q. Now, Mr. Jackson, that scantling which you brought up to put under the trough was about the same size of the one which Mr. Vernon was directed to saw off, was it not? A. I don't know about that. I don't remember the dimensions of the scantling. He told me to hand up a piece of scantling. Q. Did you see that piece of scantling on the floor before you left for the hammer and nails? A. There was several pieces of scantling,—I had carried up a couple or more pieces myself to prize with. Q. When you got on this prize pole and after you had raised the trough, who called you from there, Mr. King or Mr. Vernon? A. Mr. King. Q. Called you to help him? A. Mr. King called me to come across and help Mr. Vernon. Q. Where was Mr. King from you? A. Sitting over near where Mr. Vernon was at

work, not far from the end of the chain. Q. How did you get out, Mr. Jackson, to the place where you were after you had finished raising up the trough? A. Walked on those girders. Q. What girders? A. Girders of the house. Q. Isn't it a fact that you went out on the prize pole? A. No, sir, couldn't have gone out on the prize pole. It was only a short piece of scantling. Q. How far are those girders apart? A. About thirty inches. Q. You couldn't have gone out on the girder that was sawed into? A. No, sir. Q. You must have gone out on some other girder? A. Yes, sir, near the west end of the house. Q. How far was that from the prize pole? A. Between the two girders,—across the second girder from the west end of the house, as well as I remember. Q. Do you remember exactly about it? A. No, I don't remember just what girder it was. Q. Do you remember whether you went out on the girder or prize pole? A. On the girder. Q. If you had gone back the same way that you came, would you have gotten hurt? A. No, because I would have gone to the ground, but I couldn't have gone to Mr. Vernon or Mr. King without having walked across those girders. Q. You could not hav egone back to the bent the same way you came out? A. Yes, sir. Q. And if on the bent you could not have gone to them? A. There wasn't room enough. You had to get far enough out to have room to walk. Q. Did you notice where Mr. King and Mr. Vernon walked? A. They walked on the girders."

The further examination and cross-examination of the plaintiff as a witness in his own behalf then proceeded as follows: "Q. Mr. Jackson, you said Mr. Vernon was in a hurry that morning,—Why? A. Mr. King asked us to hurry in order that we might get the waste material

out of the mill.  Q.  I wish you would tell the jury in your own way why you went across those girders and stepped on this one that had been sawed into to get to Mr. Vernon? A.  Because Mr. King asked me to do it.  He asked me to help him and that was the only way to get across there. Q. At the time you went across there, did you see this open space where Mr. Vernon says the piece had been cut out?  A. No, sir.  Q.  Did you realize that the end that you stepped on was unsupported?  A.  No, sir, not until it dropped from under me.

### RE-CROSS-EXAMINATION.

Q.  Had, you looked, you could have seen that this girder was sawed off?  A.  Yes, if I had seen it.

### RE-DIRECT-EXAMINATION.

Q.  When you say you didn't look, you mean you didn't get down and make a careful inspection of each joist?  A .I didn't get down and look because I didn't expect it to be cut off.  It wasn't necessary for it to be cut.  I had walked across those girders several times and wasn't expecting it to be cut into that way.  Q.  Did you look ahead of you as you walked across there?  A.  Yes, sir."

Lunie Vernon, the first witness introduced on behalf of the plaintiff, testified that he was present at the time the plaintiff received the injuries and that the circumstances connected therewith were as follows: "Well, the best I can remember it.  We had gone up there to raise the conveyor trough, and to do so we had to cut one of the joist into and put a prize pole and some blocks under

it and we prized it up after Mr. Jackson brought up some blocks and he got on the prize pole and then he came over to where I was and stepped on this joist that was sticking out and fell with him."

The witness further testified that "the trough head went running under that joist and we had to saw the joist off to raise the trough. The joist was about twelve feet and we sawed off a piece about four feet and that piece fell to the ground."

During the direct examination of the witness one of the jurors interrogated him, and we copy what then transpired: "By a juror: Q. Did the man who was hurt have to come around the foreman to get on to this joist? A. No, not particularly. He was on the end of this prize pole and got off starting over to where I was. Q. Was there anything to hide that open space there? A. No, sir, after I cut the joist into there was nothing but that trough under it. Would have been no chance for him to have fell but he stepped out there on the end of this joist. Q. Was there anything to hide the place in the missing joist? A. No, sir. Q. What was the size of the joist? A. 2x6."

On the cross-examination of the witness, the following proceedings took place: Q. When this beam was sawed off a foot from this trough, was there anything to conceal the fact that it had been sawed off? A. No, sir. Q. If Mr. Jackson had used his eyes and looked he couldn't have helped seeing where this had been sawed off, could he? A. I don't know of anything that would have kept him from it. Q. It was perfectly open? A. Yes, sir. Q. You could see it from where you were? A. Yes, sir."

Vernon was re-called as a witness on behalf of the

defendant and testified as follows: "Q. Mr. Vernon, who was present at the time you were directed to perform this work, resulting in the injury to Mr. Jackson? A. Mr. Jackson and Mr. King and myself. Q. Did Mr. King tell you, in the presence of Mr. Jackson, about sawing off that beam so that the box could be lifted? A. Yes, sir. Q. To whom was he talking? A. I thought he was talking to both of us. Q. How close was Mr. King to you when he told you that? A. May be two or three feet from me. Q. Did you hear Mr. King, after this trough was raised, direct Mr. Jackson go across the way he did to you? A. No. sir. Q. Would you have heard that if he had? A. Yes, sir, I think I would."

### CROSS-EXAMINATION.

"Q. When you spoke of Mr. Jackson being present when Mr. King told you to do the work there, was that before he went for the nails? A. Yes, sir, before. Q. While he was gone for the nails you sawed the joist into the second time? A. Yes, sir. Q. Jackson wasn't there when you did that? A. No, sir. Q. As far as you know he didn't know it had been sawed? A. No, sir. Q. Was that the nearest and most practicable way for Jackson to get across to you there, at that time? A. It was the nearest way. Q. Mr. King directed you all to hurry and do that as quick as you could? A. No, sir, he didn't hurry us, only wanted us to get the machinery running.

### RE-DIRECT EXAMINATION.

Q. Mr. Jackson could have gone back and reached you the way he went out? A. Yes, sir, went back on the

same joist he went out on, same 2x4 down by the side of the building.  Q.  If you had been in Jackson's place and hadn't known that the joist was in that shape and you were going over to where Jackson was, would you have gone the way he did?  A. Very likely I would have.

RE-DIRECT EXAMINATION.

Q.  Under the circumstances that morning you would have done like he did?  A.  I don't know how my feelings would have been."

J. R. King was then introduced on behalf of the defendant and gave the following testimony: "Q.  Were you working for the Wauchula Manufacturing and Timber Company about two years ago when Mr. Jackson was hurt there?  A.  Yes, sir.  Q.  Do you know the circumstances surrounding the accident?  A.  Yes, sir. Q.  Please tell these gentlemen if you had any talk with Mr. Vernon and Mr. Jackson relative to their work there that morning and what was said.  A.  We had some work to do in the shaving room just over the fuel.  We had a conveyor that went into this room that carried shavings in it.  This conveyor was too low and we had to raise it about a foot, probably a little more, and we had a ceiling joist in the way, and it had to be cut out.  I told Mr. Jackson and Mr. Vernon what we had to do,—that was before we left the ground.  I done that in order that they might carry the tools, and we sawed one into so we could have room to raise this trough.  We sawed that and Mr. Vernon was up there and I was up there.  The piece we sawed off we got Mr. Jackson to bring up to us—he wasn't up there when we sawed it off—we got him to bring up some nails and the piece we had sawed off.

So we took this piece to prize up this trough. I was on the prize pole myself and I asked Mr. Jackson to help me, so he got on the prize pole too. This piece we had left in the wall was just tacked there, not for anybody to get on; it was just left there with the cut in it. So Mr. Vernon called for a hammer and chisel. Mr. Vernon was to get it. All he would have had to do was reach over and hand it to him. After doing this he stepped on this joist that was cut off and he fell a distance of twelve or fourteen feet. Q. You·say Mr. Vernon called him to bring the hammer? A. Yes, sir. Q. Did you direct him to take it? A. No, sir, because we were right together. Q. Mr. King, at the time you had this conversation down on the ground, before you went up there to raise the trough, to whom were you talking? A. Both of them. Q. How near were they to you? A. As close as these men here (indicating about five feet). Q. Were they looking at you? A. Yes, sir. Q. Were you talking to both of them? A. Yes, sir. Q. Did you tell them that beam would have to be sawed off on both sides of the trough? A. Yes, sir. Q. When that was sawed off was it open and clear? A. Yes, sir. Q. You say you were on the prize pole with Mr. Jackson? A. Yes, sir. Q. How did you get back? A. Just stepped back like he should have done. There was room enough over there,—there was a big bent there. Q. You say you were there? A. Yes, sir. Q. ·Were you doing part of the work yourself? A. Yes, sir. Q. Mr. King, it has been testified to here that you were the boss man or foreman of this job, please tell the jury the extent of your authority. A. It was to see that the men worked, keep the time that they made and whether they were men suitable for the positions they held. I was under two bosses.

I had to report to the office. My work and the direction of this work was given to me from the office the day before this work was done. Q. Had you any authority to hire or discharge men without taking it up with the office? A. No, not without taking it up with the office."

On cross-examination, the witness testified as follows: Q. On this morning of the accident, who was present with you when they sawed the joist the first time? We were all there. Q. You and Vernon and Jackson? A. Yes, sir. Q. No, Jackson was sent off for some nails. A. Yes, sir. Q. While he was gone they sawed it into a second time? A. Yes, sir. Q. He was not there when that took place? A. No, sir. Q. When he came back, where were you,—on the floor or on the joist? A. I was standing on the bent. Q. What do you mean by that? A. Bent that this trough was standing on. Q. Bent was the support of the trough? A. Yes, sir. Q. Trough was used for what? A. Trough was used for trash conveyor. Q. Where was Vernon when he came back with the nails? A. In this other side of the trough. Q. And you and Vernon were waiting for the nails? A. Yes, sir. Q. When Jackson came back what did you tell him to do? A. To bring up the piece we had sawed out. Q. You simply told him to bring up a piece of scantling? A. Pointed it out to him and told him to bring it up. Q. And do what? A. Help prize up the trough with. Q. How did he get up? A. Same ladder I went up. Q. In order to do this he had to go across where Vernon was? A. No, sir. Q. Why did he start across where Vernon was? A. He was to reach across. It was only a short place. Q. You told him to go up there and hand it over to him? A. No, sir, Mr. Vernon called for it. Q. When he reached

over to hand him this, he stepped on this joist and fell? A. Yes, sir. Q. Did you tell him when he started up there,—were you watching him? A. Yes sir. Q. Did you tell him 'look out there, Mr. Jackson, we sawed that piece out while you were gone?' A. No, sir, didn't think it was necessary.

### RE-DIRECT EXAMINATION.

Q. Are you now working for the Wauchula Manufacturing and Timber Company? A. No, sir. Q. Have you any relation with them whatever? A. No, sir.

### RE-CROSS-EXAMINATION.

Q. You are now superintendent of the Fort Meade Waterworks? A. Yes, sir."

We have given the salient features of the testimony of the witnesses introduced by each of the parties litigant relating to the injuries which the plaintiff sustained and for which he seeks to hold the defendant liable. It will be observed that there is very little conflict in the testimony of the several witnesses, especially upon material points. We are of the opinion that this case is ruled by Coronet Phosphate Co. v. Jackson, 65 Fla. 170, 61 South. Rep. 318, wherein we held, as follows:

"At the common law in force in this State, except in the case of railroad employees, where the master himself has performed his duty, he is not liable to any one of his servants for the acts or negligence of any mere fellow servant or co-employee of such servant, where the fellow servant or co-employee whose negligence causes the

injury dies not sustain a representative relation to the master.

"At the common law, in force in this State, except in the case of railroad employees, where a servant is guilty of negligence that contributes proximately to his injury, he cannot hold the master liable for such injury."

Also see German-American Lumber Co. v. Hannah, 60 Fla. 70, 53 South. Rep. 516, 30 L. R. A. (N. S.) 882, wherein we announced the following principles of law:

"A verdict should be set aside when it clearly appears to be contrary to law.

"Where contributory negligence prevents recovery, and it clearly appears from the evidence that the negligence of the plaintiff so contributed proximately to the injury complained of that it would not have occurred but for the plaintiff's negligence, a verdict awarding damages should be set aside.

"At common law a plaintiff could not recover for injuries to himself caused by the negligence of another if he in any appreciable way contributed to the proximate cause of the injury. upon the theory that there is no apportionment of the results of mutual negligence.

"If a servant fails to exercise ordinary care for his safety, he cannot in general recover damages for an injury.

"Where dangers are obvious and the servant is capable of appreciating them a warning as to such dangers by the master is unnecessary."

We would also refer to Stearns & Culver Lumber Company v. Fowler, 58 Fla. 362, 50 South. Rep. 680; Taylor v. Prairie Pebble Phosphate Co., 61 Fla. 455, 54 South. Rep. 904; Prairie Pebble Phosphate Co. v. Taylor, 64 Fla. 403, 60 South. Rep. 114; Flowers v.

Louisville & Nashville R. R. Co., 55 Fla. 603, 46 South. Rep. 718.

We are clear that the evidence adduced in the instant case shows that "the negligence of the plaintiff so contributed proximately to the injury complained of that it would not have occurred but for the plaintiff's negligence."

The judgment is reversed and a new trial awarded.

TAYLOR, C. J., and WHITFIELD and ELLIS, JJ., concur.

COCKRELL, J., absent by reason of sickness.